IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 114-025 |
| | ) | |
| MICHAEL ANTHONY BROWN | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Michael Anthony Brown, facing charges of possession with intent to distribute heroin and related firearm offenses, moves the Court to suppress all evidence seized during a detention and vehicle search on September 11, 2013. (Doc. no. 22, p. 2.) Having considered all arguments made by the parties, along with all exhibits and sworn testimony provided during a May 7, 2014 evidentiary hearing, the Court hereby **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I.   **FACTS**

William Leisey is a sergeant with the Richmond County Sheriff's Office ("RCSO") in the Homicide and Violent Crimes Division. (Doc. no. 25, p. 1; Court's recording system, *For The Record*, (hereinafter "FTR"), 10:21:25 – 22:35.) On September 4, 2013, Sgt. Leisey received a phone call from a longtime friend who accused Mr. Brown of being a heroine dealer. (FTR 10:21:25 – 22:35.) This confidential informant stated that Mr. Brown was the owner and manager of Eros Bistro at 1002 Broad Street in Augusta, and that he always carried a backpack with him containing heroin. (Id.) The informant claimed that Mr. Brown sold heroine to people who visited

Eros Bistro in the evenings, and that the informant had been an eyewitness to drug transactions. (Id.) Lastly, the informant stated that Mr. Brown lived in apartment C above Eros Bistro. (Id.)

While the informant had never provided information regarding crime to Sgt. Leisey before September 4, 2013, Sgt. Leisey considered the informant trustworthy, and the information regarding Mr. Brown believable, because of his lengthy and close personal relationship with the informant and his or her spouse. (Id.) Sgt. Leisey has been a close personal friend of the informant for approximately eight years and a close personal friend of the informant's spouse for approximately fifteen years. (FTR 10:33:15 – 33:45; 10:36:20 – 36:55.) Sgt. Leisey visits with the informant and his or her spouse often, and on average five to six times per month at their residence. (Id.; FTR 10:33:15 – 33:45.) Sgt. Leisey testified that, to his knowledge, the informant had never lied to him, and Sgt. Leisey trusts the informant enough that he has unhesitatingly left his own child in the informant's care on multiple occasions. (Id.) The informant has "been there for him when times are bad." (FTR 10:37:05 – 38:40.) The informant is not currently incarcerated, has not committed any crimes in the eight years Sgt. Leisey has known him or her, has no criminal history to Sgt. Leisey's knowledge, and received nothing in exchange for the tip. (FTR 10:46:05 – 46:11.)

On the same day he received the tip, September 4, 2013, Sgt. Leisey emailed Investigator Phillip Hambrick of RCSO Narcotics Division to summarize the tip and point out that it came from a "trusted source" and "dear friend." (FTR 10:22:35 – 23:15; Government's Exhibit 1.) Inv. Hambrick asked Sgt. Leisey to find out from the informant what type of car Mr. Brown drove and where he parked, and further noted that

he had recently received similar information regarding Mr. Brown from a male that he arrested for heroin possession. (Government's Exhibit 1.) Within twenty minutes of this request, Sgt. Leisey contacted the informant, obtained from the informant a picture of Mr. Brown's red Chrysler Sebring with a dog in the backseat, and emailed this picture to Inv. Hambrick. (Id.; FTR 10:24:55 – 25:40.) During this second conversation with Sgt. Leisey, the informant stated that Mr. Brown walked his dog frequently and parked his car on the south side of Tenth Street and Broad Street. (Government's Exhibit 1; FTR 10:24:55 – 25:40.)

Two days later, on September 6, 2014, Inv. Hambrick forwarded his emails with Sgt. Leisey regarding the tip to Inv. Jason Kennedy, also of the Narcotics Division.[1] (Government's Exhibit 1.) Relying on the tip information contained therein, as well as Sgt. Leisey's statements regarding the trustworthiness of the informant, Inv. Kennedy initiated an investigation. (FTR 10:55:19 – 55:29.) That day, Inv. Kennedy obtained a picture of Mr. Brown from a police database, and drove by the building of Mr. Brown's residence at 1002 Broad Street. (FTR 10:55:40 – 57:19.) Consistent with the tip, Inv. Kennedy located a red/burgundy Chrysler Sebring parked near the building on Tenth Street, ran the vehicle's tag number, and confirmed that the vehicle was registered to Mr. Brown at the apartment's address. (Id.)

On September 10, 2013, Invs. Kennedy and Jose Ortiz conducted surveillance at the address and observed Mr. Brown leaving the apartment with a female and child. (FTR 10:57:20 – 57:50.) Mr. Brown was carrying a backpack, as the informant had told

---

[1] Inv. Kennedy wrote in his report, "On September 6, 2013 Inv. Kennedy received information from [an informant] that Michael Anthony Brown was a heroin dealer." (Defense Exhibit 1.) Inv. Kennedy clarified at the May 7th hearing that he received this information through Inv. Hambrick, not directly from the informant. (FTR 11:28:34 – 29:14.)

3

Sgt. Leisey was Mr. Brown's habit. (Id.) Inv. Kennedy did not confront Mr. Brown that day because "he did not want [Mr. Brown's] child being involved in that type of incident." (FTR 10:57:50 – 58:08.)

On September 11, 2013, while conducting surveillance at 1002 Broad Street, Invs. Kennedy and Ortiz, observed Mr. Brown arrive alone in the red Sebring and park on Tenth Street, between Broad Street and Ellis Street, at approximately 4:45 p.m. (FTR 10:58:10 – 59:08.) Inv. Kennedy pulled up next to Mr. Brown and observed that he was not wearing a seatbelt and was wearing headphones, both in violation of state traffic laws, although Inv. Kennedy testified that he had no intention of writing Mr. Brown a citation for these violations. (FTR 10:59:08 – 59:30; 11:30:03 – 31:47.) Invs. Kennedy and Ortiz then approached Mr. Brown on foot. (FTR 10:59:08 – 59:30.) Inv. Kennedy was wearing a vest with the word "SHERIFF" on front and back. (Id.)

As he and Inv. Ortiz approached Mr. Brown's vehicle, Inv. Kennedy observed Mr. Brown to be very nervous and leaning forward while moving his arms toward the driver's side floorboard of the vehicle. (FTR 10:59:30 – 59:42.) Mr. Brown appeared nervous, Inv. Kennedy testified, because his eyes "were large," he took a deep breath, and had a "look of shock on his face." (FTR 11:00:23 – 00:35.) However, Mr. Brown did not attempt to run and was not pacing, sweating profusely, stuttering, or crying. (FTR 11:35:30 – 36:11.) The fact that Mr. Brown was in the described car, coupled with his movements and nervousness as the investigators approached, indicated to Inv. Kennedy that "the tip had a very strong possibility of being . . . true." (FTR 11:08:25 – 09:31.) Inv. Kennedy asked Mr. Brown to exit the vehicle and stand on the sidewalk so

4

that they were not standing in the road. (FTR 11:00:42 – 01:04.) Inv. Kennedy observed a backpack on the front passenger seat in plain view. (Id.)

Inv. Kennedy told Mr. Brown they were investigating a complaint about drug activity and asked Mr. Brown if he had any narcotics, including heroin, to which Mr. Brown responded he did not. (FTR 11:01:04 – 01:35.) Inv. Kennedy then asked Mr. Brown if he could search him and his vehicle, to which Mr. Brown responded, "Why?" (Id.) Inv. Kennedy told Mr. Brown that he wanted to search the vehicle because of the drug complaint and Mr. Brown did not respond. (Id.) Inv. Kennedy then radioed a request for a canine to do an open-air sniff of the vehicle. (Id.) Inv. Kennedy believed he had reasonable suspicion to detain Mr. Brown based on the strength of the confidential tip and his personal observations while conducting surveillance of Mr. Brown for three days. (FTR 11:38:52 – 39:20.)

While waiting for the canine to arrive, Inv. Kennedy observed, in plain view, a handgun between the driver's seat and the center console of Mr. Brown's vehicle. (FTR 11:01:35 – 02:13.) As Inv. Kennedy approached the vehicle to secure the handgun, Mr. Brown told him he needed a warrant to search the vehicle. (Id.) Inv. Kennedy told Mr. Brown he was not searching the vehicle, but instead merely securing the handgun, to which Mr. Brown responded that it was only a pellet gun. (Id.) Inv. Kennedy confirmed this and dropped the pellet gun onto the driver's side seat. (Id.)

Mr. Brown then began recording the encounter through his cell phone camera and asked the investigators what the canine unit would do. (FTR 11:02:12 – 02:21.) This video was shown at the hearing. (Government's Exhibit 2; FTR 11:12:00-11:16:00.) Mr. Brown's wife then came outside, holding a baby, and inquired what was happening.

5

(FTR 11:02:23 – 02:31.) Inv. Kennedy testified that Mr. Brown and his wife spoke, but he could not hear what they said. (FTR 11:02:31 – 02:36.) Mr. Brown's wife then gave the baby to Mr. Brown and approached Mr. Brown's vehicle. (FTR 11:02:36 – 11:02:51.) Inv. Kennedy told her she was not allowed near the vehicle because it was part of an investigation and a canine unit was coming to conduct an open-air sniff of the vehicle. (Id.)

Deputy Johnson arrived with her canine partner, Umbro, approximately ten to fifteen minutes after Inv. Kennedy called. (FTR 11:03:08 – 03:27; 11:07:05 – 07:21.) When Dep. Johnson and Umbro arrived, they circled the vehicle and Umbro "alerted" to the driver's side of Mr. Brown's car. (Doc. no. 22, p. 2.) Inv. Kennedy opened the driver's side door and found a .38 caliber handgun on the driver's side floorboard, with the handle in the air, "like it had just been placed there." (FTR 11:03:27 – 11:03:56.) This was within one to two feet of where Mr. Brown had been sitting and in the same area that he had leaned forward when Invs. Kennedy and Ortiz approached the vehicle. (Id.) At that time, Inv. Kennedy handcuffed Mr. Brown and took him into custody for possession of a firearm by a convicted felon. (FTR 11:03:56 – 03:07; 11:06:08 – 06:32.)

Inv. Kennedy testified that he then searched the backpack in the vehicle and found, among other items, (1) 5.9 grams of heroin, (2) pills in bottles, (3) a .38 caliber revolver, (4) a digital weighing scale, (5) a glass smoking pipe, (6) ammunition, and (7) syringes. (FTR 11:04:06 – 05:24; Government's Exhibit 4.) Inv. Kennedy also found methamphetamine in the vehicle. (Id.; FTR 11:04:06 – 05:24.)

After searching the vehicle, Mr. Brown told Inv. Kennedy that he "wanted to do anything he could to not go to jail." (FTR 11:05:24 – 05:45.) Inv. Kennedy asked if he

6

had any drugs in his apartment, to which Mr. Brown responded he did not, but said that the officers could search his apartment. (Id.) In his apartment, Inv. Kennedy found .38 caliber ammunition and several empty, small plastic bags that are "commonly used by people to package narcotics for distribution." (FTR 11:05:45 – 06:07.)

In his motion to suppress, Mr. Brown agreed that he was sitting in his car when the investigators approached and asked him to exit the vehicle so they could question him in reference to a drug complaint. (Doc. no. 22, p. 2.) However, according to Mr. Brown, after he exited his vehicle and denied that he had narcotics, he asked Invs. Kennedy and Ortiz if he was being detained. (Id.) When the investigators told him he was not being detained, he attempted to leave. (Id.) Invs. Kennedy and Ortiz then stopped Mr. Brown from leaving and radioed for Dep. Johnson and Umbro. (Id.)

## II. DISCUSSION

The government conceded at the hearing that the investigators detained Mr. Brown to investigate the drug tip when they approached Mr. Brown's vehicle and ordered him to exit the vehicle and stand on the sidewalk. (FTR 12:34:20 – 34:27.) The defense conceded that probable cause existed for the vehicle search once the canine Umbro circled Mr. Brown's vehicle and alerted to the driver's side. (FTR 12:33:40 – 33:50.) These concessions narrow the debate to the pivotal issue of whether the investigators had reasonable suspicion of criminal activity at the time of the investigatory detention. The government contends that the investigators had reasonable suspicion based on the inherent reliability of the informant and the related information that Inv. Kennedy obtained in corroboration of the tip prior to the detention. Mr. Brown contends the tip did not provide a basis for reasonable suspicion because it merely recited benign, presently

observable facts and did not predict future events.  (See generally doc. no. 22.)  The Court finds in favor of the government and will not recommend the suppression of any evidence.

The burden is on the government to establish that the investigators had reasonable, articulable suspicion at the time of Mr. Brown's detention that he was engaged in or was about to engage in criminal activity.  Terry v. Ohio, 392 U.S. 1, 24 (1968); United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).  The Court must evaluate the "totality of the circumstances" to determine whether the investigators had a "particularized and objective basis" for suspecting legal wrongdoing.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007); see also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).

"Reasonable suspicion may be based on information supplied by another person, as long as the information bears sufficient indicia of reliability."  United States v. McCall, No. 13-13890, 2014 WL 1504760, at *4 (11th Cir. Apr. 18, 2014) (*per curiam*) (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)).  The extent to which police must scrutinize a tip to determine its reliability depends on the extent to which police are familiar with the informant and can assess his or her character for truthfulness and basis of knowledge.  See id.

An anonymous phone tip requires the most rigorous scrutiny because the tip alone seldom, if ever, sufficiently demonstrates the informant's basis of knowledge and character for truthfulness. Florida v. J.L., 529 U.S. 266, 270 (2000) (internal citations omitted). Requiring less scrutiny is a face-to-face tip from an anonymous person, which is presumed to be more reliable because "the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant." United States v. Mostowicz, 471 F. App'x 887, 889 (11th Cir. 2012) (*per curiam*); United States v. Heard, 367 F.3d 1275, 1279-80 (11th Cir. 2004).

A tip from a known, criminal informant who is cooperating with law enforcement requires even less scrutiny because the police can assess the informant's reputation and character, and hold the informant responsible if his or her allegations turn out to be fabricated. Heard, 367 F.3d at 1279-80. At the most reliable end of the scale is an "'unquestionably honest citizen'" who "'comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability.'" United States v. Williams, 177 F. App'x 914, 919 (11th Cir. 2006) (*per curiam*) (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)). Not surprisingly, rigorous scrutiny of such an unquestionably honest citizen "may be unnecessary." Id.

Here, the informant is an unquestionably honest citizen whose tip gave rise to reasonable suspicion without the need for scrutiny. In fact, it is difficult to imagine an informant who could be better known to the police and more reliable. Sgt. Leisey testified that the informant has been a dear friend of his for eight years, and he unequivocally vouched for the informant's credibility. (See FTR 10:33:15 – 33:45; 10:36:20 – 36:55.) It is not a distant friendship. On the contrary, Sgt. Leisey visits the

informant's residence five to six times a month, trusts the informant to care for his child, and the informant "has been there for him when times are bad." (See FTR 10:33:15 – 33:45; 10:36:20 – 36:55; 10:37:05 – 38:40.) During their lengthy, close relationship, the informant has never lied to Sgt. Leisey and has committed no crimes, and Sgt. Leisey has no reason to suspect that the informant has any criminal history. (See FTR 10:46:05 – 46:11; 10:33:15 – 33:45; 10:36:20 – 36:55.) And unlike so many known informants, this informant was not a criminal with ties to criminal enterprises that hoped for more favorable treatment in exchange for the tip. (FTR 10:46:05 – 46:11.) In sum, Sgt. Leisey has a firm foundation for his unequivocal opinion that the informant tells the truth about all things and thus can be trusted "to tell the truth about other things, 'including the claim that the object of the tip is engaged in criminal activity.'" ." Navarette v. California, 134 S. Ct. 1683, 1688 (2014) (citing Alabama v. White, 496 U.S. 325, 332 (1990)).

The tip is also entitled to deference, and is presumptively valid, because the informant claimed to be an eyewitness to multiple drug transactions conducted by Mr. Brown. This is a strong basis of knowledge. As the Eleventh Circuit explained, "courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources." United States v. Martinelli, 454 F.3d 1300, 1307 (11th Cir. 2006); see also United States v. Burbridge, 252 F.3d 775, 778-79 (5th Cir. 2001) (finding that citizen or eye-witness account of criminal activity is entitled to presumption of reliability and veracity); United States v. Harding, 273 F. Supp. 2d 411, 418-19 (S.D.N.Y. 2003) ("Information provided by a crime victim or other citizen witness may be accepted even absent a proven track record of reliability or corroboration. In other words, the requirement of prior reliability

or corroboration is addressed to the 'particular problem of professional informers.'") (citations omitted); compare J.L., 529 U.S. at 271 (finding that anonymous tip about individual carrying gun lacked indicia of reliability because "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].")

Even if this were a situation requiring scrutiny and independent verification of the tip, which it is not, the investigators conducted a sufficient investigation and were able to corroborate a multitude of material facts from the tip. Inv. Kennedy confirmed that Mr. Brown drove a red Chrysler Sebring, always carried a backpack, parked on Tenth Street between Broad Street and Ellis Street, and resided in an apartment above Eros Bistro. Mr. Brown points out that these were presently observable facts about him that did not suggest any criminal activity, and that the tip did not predict future behavior. (Doc. no. 22, p. 4.) As to the benign nature of the corroborated facts, "reasonable suspicion need not rule out the possibility of innocent conduct." Navarette, 134 S. Ct. at 1691 (internal quotation marks omitted). With respect to the absence of a prediction of future behavior, even an anonymous tip is not *per se* unreliable merely because the source does not predict future behavior. See Id. at 1688. Here, the investigators had ample cause to reasonably suspect criminal activity, without any need for the informant to predict Mr. Brown's future actions, based on the informant's unquestionable character for truthfulness, her claimed status as an eyewitness to multiple drug deals by Mr. Brown, and the multitude of facts regarding Mr. Brown described by the informant and confirmed by the investigators.

Citing opinions from outside the Eleventh Circuit, United States v. Taylor, 162 F.3d 12 (1st Cir. 1998) and United States v. Taylor, 301 F. App'x 508, 514 (6th Cir. 2008), Defendant argues that an officer's personal relationship with an informant, without more, is not enough to establish reliability of the tip. Neither case stands for that proposition. Both hold that a tip is reliable without rigorous scrutiny when a criminal informant has provided accurate tips to the police in the past. See Taylor, 162 F.3d at 15; Taylor, 301 F. App'x at 513-14. In contrast, and as explained above, little if any scrutiny is necessary where, as here, an unquestionably honest citizen informant claims to be an eyewitness to criminal activity.[2]

### III. CONCLUSION

Because Invs. Kennedy and Ortiz had reasonable suspicion to detain Mr. Brown on September 11, 2013, the Court **REPORTS** and **RECOMMENDS** that Mr. Brown's motion to suppress be **DENIED**. (Doc. no. 22.)

SO REPORTED and RECOMMENDED this 9th day of June, 2014, at Augusta, Georgia.

*/s/ Brian K. Epps*
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[2] At the hearing, defense counsel argued for the first time that the investigative detention was not sufficiently limited in duration. (FTR 12:35:25 – 35:45.) Mr. Brown's detention was sufficiently limited in scope and duration because (1) the detention was solely for the purpose of conducting a canine sniff for drugs, (2) Inv. Kennedy radioed for the canine unit immediately after asking Mr. Brown to exit his vehicle, (3) the canine united arrived within ten to fifteen minutes, and (4) Inv. Kennedy searched the vehicle only after the canine alerted. See, e.g., United States v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006) (enumerating factors for determining whether search exceeds scope and duration).